## ALGOMA PLYWOOD & VENEER CO. *v.* WISCONSIN EMPLOYMENT RELATIONS BOARD.

No. 216.   Argued November 18, 1948.—Decided March 7, 1949.

302

*Roger C. Minahan* argued the cause for petitioner. With him on the brief was *Malcolm K. Whyte.*

*Beatrice Lampert,* Assistant Attorney General of Wisconsin, argued the cause for respondent. With her on the brief were *Grover L. Broadfoot,* Attorney General, and *Stewart G. Honeck,* Deputy Attorney General.

*David Previant* filed a brief on behalf of the United Brotherhood of Carpenters and Joiners of America, A. F. of L., as *amicus curiae,* urging reversal.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The Algoma Plywood & Veneer Co. manufactures in Kewaunee County, Wisconsin, the products for which it is named. Ninety-five per cent of its output is sold in interstate commerce. In 1942 the National Labor Relations Board held an election at the plant, the outcome of which was the certification of Local 1521 of the Carpenters and Joiners Union as bargaining representative for all production employees, about 650 in number. In 1943, under pressure from the Department of Labor and the War Labor Board, Algoma agreed to a maintenance-of-membership clause in its contract with Local 1521. That clause was carried over from year to year and was part of the contract effective for the year following April 29, 1946. One Victor Moreau refused to pay dues, and on Jan. 7, 1947, the Union notified him that unless he paid up by Jan. 13, he would be discharged. On Jan. 14, 1947, in the presence of representatives of the Company and the Union, he said that he would rather quit than pay dues to the Union. And so the Vice-President of the Company told him to collect his pay and go home.

On Jan. 27, 1947, Moreau filed with the Wisconsin Employment Relations Board a complaint charging the Company with an unfair labor practice under Wis. Stat. § 111.06 (1) (c) 1, which provides:

> "It shall be an unfair labor practice for an employer . . . to encourage . . . membership in any labor organization . . . by discrimination in regard to hiring, tenure or other terms or conditions of employment; provided, that an employer shall not be prohibited from entering into an all-union agreement with the representatives of his employes in a collective bargaining unit, where at least two thirds of such employes voting . . . shall have voted

affirmatively by secret ballot in favor of such all-union agreement in a referendum conducted by the board. . . ."

No referendum had been conducted at the Algoma plant. The Board, accordingly, on April 30, 1947, ordered the Company to cease and desist from giving effect to the maintenance-of-membership clause, to offer Moreau reinstatement, and to make him whole for any loss of pay. The Company and the Union petitioned the Wisconsin Circuit Court of Kewaunee County for review of the order, and the Board petitioned for its enforcement. In its judgment of Nov. 21, 1947, the Circuit Court modified the order by striking the award of back pay, but otherwise affirmed it. On May 11, 1948, the Wisconsin Supreme Court affirmed the judgment of the Circuit Court insofar as it sustained the jurisdiction of the Board to issue its cease and desist order and to require an offer of reinstatement but directed enforcement of the back-pay award. 252 Wis. 549, 32 N. W. 2d 417.

At every stage of the proceedings the Company and the Union contested the jurisdiction of the Employment Relations Board on the ground of the exclusive authority of the National Labor Relations Board under § 10 (a) of the National Labor Relations Act, 49 Stat. 453, 29 U. S. C. § 160 (a), and asserted the repugnancy of Wis. Stat. § 111.06 (1) (c) 1 to § 8 (3) of the National Labor Relations Act, 49 Stat. 452, 29 U. S. C. § 158 (3). We granted certiorari under 28 U. S. C. § 1257 (3) because of the important bearing of these issues upon the distribution of power in our federal system. 335 U. S. 812.

The discharge of Moreau and the orders of the Wisconsin Board preceded the Labor Management Relations Act, 1947, colloquially known as the Taft-Hartley Act, 61 Stat. 136, 29 U. S. C. § 141 *et seq.* The judgments of the Circuit Court for Kewaunee County and the Supreme Court of Wisconsin were rendered after it came into

force. If the National Labor Relations Act gave affirmative protection to the employer in discharging an employee under a union-security agreement for failure to maintain union membership, it would be necessary to decide whether adoption of the Taft-Hartley Act retroactively removed that protection and whether it equally gave effect to a reinstatement order, an award of back pay, and a cease and desist order which would previously have been invalid. Since, however, we do not find conflict between the Wisconsin law under which the orders were issued and either the National Labor Relations Act or the Taft-Hartley Act, we are relieved from defining the respective applicability of the federal Acts.

In seeking to show that the Wisconsin Board had no power to make the contested orders, petitioner points first to § 10 (a) of the National Labor Relations Act, which is set forth in the margin.[1] It argues that the grant to the National Labor Relations Board of "exclusive" power to prevent "any unfair labor practice" thereby displaced State power to deal with such practices, provided of course that the practice was one affecting commerce. But this argument implies two equally untenable assumptions. One requires disregard of the parenthetical phrase "(listed in section 8)"; the other depends upon attaching to the section as it stands, the clause "and no other agency shall have power to prevent unfair labor practices not listed in section 8."

The term "unfair labor practice" is not a term of art having an independent significance which transcends its statutory definition. The States are free

---

[1] "SEC. 10. (a) The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce. This power shall be exclusive, and shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise."

(apart from pre-emption by Congress) to character-
ize any wrong of any kind by an employer to an em-
ployee, whether statutorily created or known to the
common law, as an "unfair labor practice." At the time
when the National Labor Relations Act was adopted,
the courts of many States, at least under some circum-
stances, denied validity to union-security agreements.
See 1 Teller, Labor Disputes and Collective Bargaining
§ 170 (1940). Here Wisconsin has attached conditions
to their enforcement and has called the·voluntary observ-
ance of such a contract when those conditions have not
been met an "unfair labor practice." Had the sponsors
of the National Labor Relations Act meant to deny effect
to State policies inconsistent with the unrestricted en-
forcement of union-shop contracts, surely they would have
made their purpose manifest. So far as appears from
the Committee Reports, however, § 10 (a) was designed,
as its language declares, merely to preclude conflict in
the administration of remedies for the practices pro-
scribed by § 8. The House Report, after summarizing
the provisions of the section, adds, "The Board is thus
made the paramount agency for dealing with the unfair
labor practices described in the bill." H. R. Rep. No.
969, 74th Cong., 1st Sess. 21. See also the identical
language of H. R. Rep. No. 972, 74th Cong., 1st Sess. 21
and H. R. Rep. No. 1147, 74th Cong., 1st Sess. 23. And
the Senate Report describes the purpose of the section
as "intended to dispel the confusion resulting from dis-
persion of authority and to establish a single paramount
administrative or quasi-judicial authority in connection
with the development of the Federal American law re-
garding collective bargaining." S. Rep. No. 573, 74th
Cong., 1st Sess. 15.

The contention that § 10 (a) of the Wagner Act swept
aside State law respecting the union shop must therefore

be rejected. If any provision of the Act had that effect, it could only have been § 8 (3), which explicitly deals with membership in a union as a condition of employment. We now turn to consideration of that section.

Section 8 (3) provides that it shall be an unfair labor practice for an employer

> "By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this Act . . . or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made."

It is argued, therefore, that a State cannot forbid what § 8 (3) affirmatively permits. The short answer is that § 8 (3) merely disclaims a national policy hostile to the closed shop or other forms of union-security agreement. This is the obvious inference to be drawn from the choice of the words "nothing in this Act . . . or in any other statute of the United States," and it is confirmed by the legislative history.

The Senate Report on the bill which was to become the National Labor Relations Act has this to say about § 8 (3):

> "The proviso attached to the third unfair-labor practice deals with the question of the closed shop. Propaganda has been wide-spread that this proviso attaches special legal sanctions to the closed shop or seeks to impose it upon all industry. This propa-

ganda is absolutely false. The reason for the inser-
tion of the proviso is as follows: According to some
interpretations, the provision of section 7 (a) of the
National Industrial Recovery Act, assuring the free-
dom of employees 'to organize and bargain collec-
tively through representatives of their own choosing',
was deemed to illegalize the closed shop. The com-
mittee feels that this was not the intent of Congress
when it wrote section 7 (a); that it is not the intent
of Congress today; and that it is not desirable to
interfere in this drastic way with the laws of the
several States on this subject.

"But to prevent similar misconceptions of this bill,
the proviso in question states that nothing in this
bill, or in any other law of the United States, or in
any code or agreement approved or prescribed there-
under, shall be held to prevent the making of closed-
shop agreements between employers and employees.
In other words, the bill does nothing to facilitate
closed-shop agreements or to make them legal in
any State where they may be illegal; it does not
interfere with the *status quo* on this debatable sub-
ject but leaves the way open to such agreements as
might now legally be consummated . . . ." S. Rep.
No. 573, 74th Cong., 1st Sess. 11–12.

The House Report contains similar language:

"The proviso to the third unfair labor practice,
dealing with the making of closed-shop agreements,
has been widely misrepresented. The proviso does
not impose a closed shop on all industry; it does
not give new legal sanctions to the closed shop. All
that it does is to eliminate the doubts and miscon-
structions in regard to the effect of section 7 (a) upon
closed-shop agreements, and the possible repetition
of such doubts and misconstructions under this bill,

by providing that nothing in the bill or in section 7 (a) or in any other statute of the United States shall illegalize a closed-shop agreement between an employer and a labor organization, provided such organization has not been established, maintained, or assisted by any action defined in the bill as an unfair labor practice and is the choice of a majority of the employees, as provided in section 9 (a), in the appropriate collective bargaining unit covered by the agreement when made. The bill does nothing to legalize the closed-shop agreement in the States where it may be illegal; but the committee is confident that it would not be the desire of Congress to enact a general ban upon closed-shop agreements in the States where they are legal. And it should be emphasized that no closed shop may be effected unless it is assented to by the employer." H. R. Rep. No. 969, 74th Cong., 1st Sess. 17. See also the identical language in H. R. Rep. No. 972, 74th Cong., 1st Sess. 17, and H. R. Rep. No. 1147, 74th Cong., 1st Sess. 19–20.

In his major speech to the Senate in support of the bill, Senator Wagner said:

"While outlawing the organization that is interfered with by the employer, this bill does not establish the closed shop or even encourage it. The much-discussed closed-shop proviso merely states that nothing in any Federal law shall be held to illegalize the confirmation of voluntary closed-shop agreements between employers and workers." 79 Cong. Rec. 7570.

The Senator went on to explain the purpose of the section as dispelling misunderstanding of § 7 (a) of the National Industrial Recovery Act, 48 Stat. 198, denied

either advocacy or disapproval of the closed shop, then added:

> "The virulent propaganda to the effect that this bill encourages the closed shop is outrageous in view of the fact that in two respects it actually narrows the now-existing law in regard to the closed-shop agreement." *Ibid.*

Later, during discussion of proposed amendments, Senator Wagner answered a question from the floor about the effect of the proviso in the following words:

> "The provision will not change the status quo. That is the law today; and wherever it is the law today that a closed-shop agreement can be made, it will continue to be the law. By this bill we do not change that situation." *Id.* at 7673.

Equally conclusive is the answer by Representative Connery, manager of the bill in the House, to a statement by Representative Taber in support of an amendment which would have entirely stricken the proviso. Representative Taber charged that the proviso would make it possible for 51% of the employees of any organization to bring about the discharge of the other 49%. Representative Connery said:

> "Mr. Chairman, I merely rise to say this in opposition: The closed-shop proposition in this bill does not refer to any State which has any law forbidding the closed shop. It does not interfere with that in any way." *Id.* at 9726.

No ruling by the courts or the National Labor Relations Board, the agency entrusted with administration of the Wagner Act, has adopted a construction of § 8 (3) in disregard of this legislative history. It is suggested, however, that the interpretation given the section by the War Labor Board supports petitioner's position. The

Board, it is true, in view of the practical desirability of the maintenance-of-membership clause in settling wartime disputes over union security found authority to order contracts containing such clauses despite inconsistent State law. It found such authority, however, not in § 8 (3) but in the conclusion that "its power to direct the parties to abide by the maintenance-of-membership provision in such a case as this one stems directly from the war powers of the United States Government." *Greenebaum Tanning Co.*, 10 War Lab. Rep. 527, 534.[2] The Supreme Court of Wisconsin itself acknowledged the supremacy of the war power in a decision suspending an order directing the reinstatement of an employee discharged under a maintenance-of-membership clause ordered by the War Labor Board. *International Brotherhood of Papermakers* v. *Wisconsin E. R. Board,* 245 Wis. 541, 15 N. W. 2d 806. When the orders of the Wisconsin Board in the present case were entered, the War Labor Board had ceased to exist, Exec. Order No. 9672, 11 Fed. Reg. 221, and, with the occasion that had called it into

---

[2] Although some language in the *Greenebaum* opinion seems to point to an interpretation of § 8 (3) inconsistent with its legislative history, see 10 War Lab. Rep. at 542–43, the Board adopted as its own the conclusion of its General Counsel, Mr. Lloyd K. Garrison, reached in a full-dress opinion which reviewed that history. 10 War Lab. Rep. at 541. The General Counsel had said: "The National Labor Relations Act does not preclude a governmental agency from ordering maintenance of membership in suitable cases for the purpose of settling disputes and stabilizing industrial relations in time of war." 12 War Lab. Rep. ix, xxii. The next two cases ordering a maintenance-of-membership contract which would not have been permitted by State law did not mention the National Labor Relations Act. *Fairbanks, Morse & Co.*, 11 War Lab. Rep. 217; *Vilter Mfg. Co.*, 11 War Lab. Rep. 332. In later cases, the Board adhered to its reliance upon the war power. *U. S. Vanadium Corp.*, 13 War Lab. Rep. 527; *Ingalls Iron Works Co.*, 17 War Lab. Rep. 190; *Cudahy Bros. Co.*, 19 War Lab. Rep. 124.

being, the necessity for suppression of State law had also come to an end.[3]

Since we would be wholly unjustified, therefore, in rejecting the legislative interpretation of § 8 (3) placed upon it at the time of its enactment, it is not even necessary to invoke the principle that in cases of concurrent power over commerce State law remains effective so long as Congress has not manifested an unambiguous purpose that it should be supplanted. See, e. g., *Sinnot* v. *Davenport*, 22 How. 227; *Missouri, K. & T. R. Co.* v. *Haber*, 169 U. S. 613. Nor need we, if Congress in enacting § 8 (3) did not mean to enlarge the right to bargain for union security, consider contentions based on *Hill* v. *Florida*, 325 U. S. 538, to the effect that in guaranteeing the right to collective bargaining the National Labor Relations Act also guaranteed the right to contract upon any terms which are commonly the subject of collective bargaining.

---

[3] The significance of the War Labor Board's determination of the impact of federal power on State law must be viewed in the light of the fact that it was an agency of the War Administration organized not to interpret the Constitution but to prevent interruption of production. See Exec. Order No. 9017, 7 Fed. Reg. 237. That the two rôles are quite distinct is illustrated by the policy of the War Labor Board of the First World War which outlawed "yellow-dog" contracts for the duration of that war, thereby in effect nullifying this Court's then recent decision in *Hitchman Coal & Coke Co.* v. *Mitchell*, 245 U. S. 229. See *Smith & Wesson Co.*, War Lab. Bd. Docket No. 273; Gregg, *The National War Labor Board*, 33 Harv. L. Rev. 39, 54. The difference in rôles is again emphasized by the ruling of the War Labor Policies Board of 1918 that all Government contracts should contain a clause prohibiting the use of child labor, although *Hammer* v. *Dagenhart*, 247 U. S. 251, invalidating such a child-labor provision, was decided within a few weeks after that Board was established. See 6th Ann. Rep. of the Secretary of Labor 114 (1918); 7th Ann. Rep. of the Secretary of Labor 126 (1919); Report on International Labor Standards 43 (prepared in 1918 by the War Labor Policies Board, undated).

We come now to the question whether the Taft-Hartley Act expresses a policy inconsistent with § 111.06 (1) (c) 1 of the Wisconsin Employment Peace Act.

Section 10 (a) of the Taft-Hartley Act, which is set forth in the margin,[4] contains important changes, but none requiring modification of the conclusions we have reached as to the corresponding section of the National Labor Relations Act. One phrase, however, reinforces those conclusions; that is the phrase "inconsistent with the corresponding provision of this Act." These words must mean that cession of jurisdiction is to take place only where State and federal laws have parallel provisions. Where the State and federal laws do not overlap, no cession is necessary because the State's jurisdiction is unimpaired. This reading is confirmed by the purpose of the proviso in which the phrase is contained: to meet situations made possible by *Bethlehem Steel Co.* v. *New York S. L. R. B.*, 330 U. S. 767, where no State agency would be free to take jurisdiction of cases over which the National Board had declined jurisdiction. See H. R. Rep. No. 245, 80th Cong., 1st Sess. 40; S. Rep. No. 105, Minority Views, Part 2, 80th Cong., 1st Sess. 38.

Other provisions of the Taft-Hartley Act make it even clearer than the National Labor Relations Act that the

---

[4] "SEC. 10. (a) The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided,* That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this Act or has received a construction inconsistent therewith."

States are left free to pursue their own more restrictive policies in the matter of union-security agreements. Because § 8 (3) of the new Act forbids the closed shop and strictly regulates the conditions under which a union-shop agreement may be entered, § 14 (b) was included to forestall the inference that federal policy was to be exclusive. It reads:

> "Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

It is argued, however, that the effect of this section is to displace State law which "regulates" but does not wholly "prohibit" agreements requiring membership in a labor organization as a condition of employment. But if there could be any doubt that the language of the section means that the Act shall not be construed to authorize any "application" of a union-security contract, such as discharging an employee, which under the circumstances "is prohibited" by the State, the legislative history of the section would dispel it. See S. Rep. No. 105, 80th Cong., 1st Sess. 5–7; H. R. Rep. No. 245, 80th Cong., 1st Sess. 9, 34, 40, 44; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 60; 93 Cong. Rec. 3554, 3559, 4904, 6383–84, 6446; H. R. 3020, 80th Cong., 1st Sess., as reported, § 13.

It remains to consider whether certification of the Union by the National Labor Relations Board in 1942 thereby forever ousted jurisdiction of the Wisconsin Board to enjoin practices forbidden by Wisconsin law. Since the enumeration by the Wagner Act and the Taft-Hartley Act of unfair labor practices over which the National Board has exclusive jurisdiction does not prevent the States from enforcing their own policies in matters not governed by the federal law, such freedom of action

by a State cannot be lost because the National Board has once held an election under the Wagner Act. The character of activities left to State regulation is not changed by the fact of certification. Certification, it is true, makes clear that the employer and the union are subject to federal law, but that is not disputed. So far as the relationship of State and national power is concerned, certification amounts to no more than an assertion that as to this employer the State shall not impose a policy inconsistent with national policy, *Hill* v. *Florida,* 325 U. S. 538, or the National Board's interpretation of that policy, *Bethlehem Steel Co.* v. *New York S. L. R. B.,* 330 U. S. 767; *La Crosse Telephone Corp.* v. *Wisconsin E. R. B.,* 336 U. S. 18. Indeed, the express disclaimer in § 8 (3) of the National Labor Relations Act of intention to interfere with State law and the permission granted the States by § 14 (b) of the Taft-Hartley Act to carry out policies inconsistent with the Taft-Hartley Act itself, would be practically meaningless if so easily avoided. For these provisions can have application, obviously, only where State and federal power are concurrent; it would have been futile to disclaim the assertion of federal policy over areas which the commerce power does not reach.

Since, therefore, the effect given the Wisconsin Employment Peace Act by the judgment below does not conflict with the enacted policies of Congress, that judgment is

*Affirmed.*

MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE concur in the result.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, dissenting.

The decision just rendered holds that the State of Wisconsin can compel the petitioner to pay unearned back wages to an employee found to have been discharged

by petitioner under the terms of a collective bargaining agreement which required such discharge. The petitioner had originally entered into the agreement in response to irresistible pressure by the United States Government. 252 Wis. 549, 559, 32 N. W. 2d 417. The circumstances under which the contract was made were these:

From 1938 to 1943 the company and the union were in an almost constant wrangle. The chief bone of controversy throughout this five-year period was the union's demand for a "closed shop." Petitioner resolutely fought for an "open shop." In 1938 the union took its cause to the National Labor Relations Board. After a long hearing of which the closed shop issue was a prominent phase, that Board in 1940 ordered petitioner to bargain with the union on the pending issues. *Algoma Plywood Co.*, 26 N. L. R. B. 975, 980, 1002 (1940). The Court of Appeals, referring to the closed shop question as the "main stumbling block" between petitioner and the union, refused to enforce the order on the ground that it was not clear that the union represented a majority of petitioner's employees. *Labor Board* v. *Algoma Plywood Co.*, 121 F. 2d 602, 606, 611. Thereafter, early in 1942, petitioner appealed to the Wisconsin Employment Relations Board to conduct an election. The union went to the National Board; petitioner withdrew its state board application; the National Board conducted an election; the union won, and the old closed shop controversy was renewed with increased intensity.

The union appealed to the National War Labor Board to settle the closed shop dispute. That Board, in collaboration with the United States Department of Labor, put pressure on petitioner to yield to the union's demands. Petitioner was informed that unless it agreed to a maintenance of membership clause, which was at the time forbidden by Wisconsin law, the clause "would be put in by the War Labor Board anyhow" since inclusion of

such provisions was a part of that Board's national policy. Thus fired at from one side by the state and from the other side by powerful federal agencies, petitioner had to flee to one side or the other. Neither side offered a safe sanctuary. In weighing the conflicting considerations, petitioner not unreasonably found the scales tipped on the United States' side. Had petitioner refused the demands of the federal agency, the Government could and might have seized and operated its plants.[1] Furthermore, petitioner's employees might have stopped work. In response to its best judgment, though contrary to its own strong desires, petitioner finally yielded to the Federal Government's demands and agreed to the union's terms. January 23, 1943, a collective bargaining agreement was executed which contained the controversial maintenance of union membership clause and an automatic extension clause. This contract was approved by the War Labor Board. The controversial clause was extended automatically from year to year and was in effect when the alleged discharge took place. The Court apparently concedes that this clause of the collective bargaining contract was valid when petitioner entered into it under federal compulsion. In my judgment it was equally valid when

---

[1] The dire consequences of a violation of a Board order is illustrated by *United States* v. *Montgomery Ward,* 150 F. 2d 369. This Court granted certiorari and ordered the judgment vacated on the ground that the cause had become moot. 326 U. S. 690. In this case Montgomery Ward refused to carry out an order of the War Labor Board. One of the subjects of the order was a maintenance of membership clause similar to the one involved in this case. The action in this *Montgomery Ward* case was brought by the United States to test the legality of an order of the President of the United States directing seizure of the properties of Montgomery Ward because of the refusal of that company to obey the Board's order. The Court of Appeals upheld the legality of the seizure order. See also *National War Labor Bd.* v. *Montgomery Ward,* 79 U. S. App. D. C. 200, 144 F. 2d 528; and *United States* v. *Montgomery Ward,* 58 F. Supp. 408.

the employee was discharged under it. It seems at least a questionable interpretation of federal statutory policy for this Court—a federal tribunal—to hold that a state is free to impose a money penalty on this company for acting in obedience to a contract which a federal agency validly compelled it to make.[2]

## I.

The Court's concession that the contract was valid when made rests on the premise that the statute creating the War Labor Board stemmed from the war power of Congress and that under this power the War Labor Board could, as it did, force petitioner to make the contract. *Greenebaum Tanning Co.*, 10 War Lab. Rep. 527. But, says the Court, when Wisconsin entered the back-pay order, the War Labor Board had ceased to exist and on its dissolution on January 4, 1946, Wisconsin became possessed of the power to order petitioner to break his contract. In other words, the holding seems to be that the discontinuance of the War Labor Board automatically and instantly empowered the states to impair and nullify all collective bargaining contracts entered into under authority of the supreme federal policy embodied in the National War Labor Board Act. For several reasons, I cannot agree.

1. The termination of the War Labor Board was accomplished by Executive Order of the President, No. 9672. 11 Fed. Reg. 221. But there is nothing in that Executive

---

[2] The Wisconsin trial court refused to impose this "penalty" on petitioner. It found the "equities" on petitioner's side. The State Supreme Court held that the compulsion under which petitioner had acted could not relieve him from the state penalty which was imposed to "retard the employer's inclination to yield to this compulsion in the future." 252 Wis. 549, 561, 32 N. W. 2d 417, 423. In other words the penalty was imposed as a warning to petitioner and others that continued compliance with the federal policy would subject them to penalties in Wisconsin.

Order that indicates a purpose to authorize invalidation of contracts made under the Board's directions. A contrary purpose is indicated. The Executive Order established the National Wage Stabilization Board. As the name of that Board indicates, it was established to exercise functions in connection with wage disputes which might adversely affect the national economy. For the limited purposes enumerated in the Order the new Board was vested with all the "powers, functions, and responsibilities of the National War Labor Board . . . ." While scope for operation of these powers was within more narrow limits than had been the scope of the War Labor Board's powers, the creation of this new Board negatives any possible contention that dissolution of the War Labor Board showed an intention to permit states to invalidate previously executed legal contracts approved by the War Labor Board in the interests of industrial peace. And far from indicating a presidential belief that wage stabilization and industrial peace were no longer essential in the war emergency period, the new Executive Order, as had the old, rested on the war power and the statutes that had stemmed from it. The War Labor Board was created to implement a congressional war policy expressed in part in the War Labor Disputes Act. 57 Stat. 163. The Board's dissolution could not detract from the force of the statute or from the congressional war power. See *Kelly* v. *Washington,* 302 U. S. 1, 14. This Executive Order recognized the continued existence of conditions that called for the further exercise of war powers. It was promulgated January 4, 1946. The last automatic extension of the compelled contract was April 4, 1946. This automatically extended contract was the basis for the discharge. Under the foregoing circumstances I cannot agree that dissolution of the War Labor Board authorized Wisconsin to punish petitioner for its continued observance of the contract.

2. That the President correctly assumed the continued existence of war powers after the cessation of hostilities seems beyond question in the light of this Court's holding in *Ludecke* v. *Watkins,* 335 U. S. 160, 166–170. The holding in the *Ludecke* case was that the war had not at that time officially ended and that the congressional war power still existed in May, 1947. This was long after the dissolution of the War Labor Board and the employee's discharge. In light of the 1947 *Ludecke* holding it seems odd that dissolution of the War Labor Board should now be held an adequate reason for permitting a state in 1947 to invalidate contracts previously entered into in obedience to federal commands made under a valid federal law rooted in the war power. It seems to me that the Court's holding today can be justified if at all only by adopting the holding of the Wisconsin Supreme Court in this case. That court supported the state penalty imposed on petitioner by concluding that the National War Labor Board's action was *ultra vires.* Its reasoning was that national war powers had "ended" in 1946. 252 Wis. at 560, 32 N. W. 2d 522. But in the *Ludecke* case this Court held those powers still existed in 1947. The result here is all the more inexplicable when it is considered that wholesale invalidation of those federally authorized contracts could result in serious industrial conflicts at a time when industrial relationships were extremely strained due to the transition from a war to a peace economy. *Woods* v. *Miller Co.,* 333 U. S. 138, 144.

3. I suppose it cannot be denied that congressional authority to force contracts under the war power carries with it authority to provide that (at least during the existence of the war power) the obligations assumed under those contracts should be faithfully observed and that the contracts should be invulnerable to state attack. In this view after the War Labor Board ceased to exist and before

peace had been officially declared, Congress under the war power doubtless could have made it possible under enumerated contingencies for states to invalidate contracts such as this one. But no suggestion has been made that any statutory language of Congress can be stretched far enough to find such congressional intent. Since no such intent has been manifested, it seems fair to assume that Congress intended that such contracts should remain immune from state attack and continue in force unless terminated under their valid provisions. I would therefore hold that petitioner was obligated to continue to observe the terms of the contract until terminated according to its provisions.

The contract had not terminated when the War Labor Board ceased to exist. It had been given continued vitality under its own original terms, terms which must be interpreted under controlling federal law authorizing the contract's creation. I may assume at this point that the contract was invulnerable to state impairment or nullification only because of congressional authority stemming from the war power. Even so and despite the dissolution of the War Labor Board, I think the state was without power to penalize petitioner for observance of the contract, at least during the period in which the war had not officially ended.

## II.

It is apparent that the Wisconsin statute as here applied deprives petitioner and his employees of a substantial federal right if § 8 (3) of the National Labor Relations Act [3] authorized union membership maintenance agreements without regard to contrary state policies. For given that interpretation of § 8 (3), the Wisconsin Act would not only impair collective bargaining rights

---

[3] See note 10, p. 326.

protected by § 8 (3); [4] it would also stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hill* v. *Florida,* 325 U. S. 538, 542; *Bethlehem Steel Co.* v. *New York Labor Bd.,* 330 U. S. 767, 775–776.

The Wisconsin Employment Relations Board began proceedings against the petitioner eleven years after passage of the National Labor Relations Act. During that entire eleven-year period it seems to have been generally assumed that § 8 (3) was an unequivocal federal authorization for collective bargaining provisions of the type here made. This Court had noticed that such provisions were "frequent subjects of negotiation between employers and employees," and had strongly indicated that it was an unfair labor practice for an employer to refuse to bargain concerning them. *National Licorice Co.* v. *Labor Board,* 309 U. S. 350, 360. Both the courts and the National Labor Relations Board have held that efforts of employers to frustrate the right of unions to bargain for exclusive union employment constituted a violation of the federal Act for which employers could be held accountable. [5]

The action of the United States Department of Labor and the National War Labor Board in forcing this petitioner to accept a maintenance of membership provision in its collective bargaining agreement was not the result of an isolated or haphazard interpretation of § 8 (3) of the

---

[4] See *Allen-Bradley Local* v. *Wisconsin Employment Board,* 315 U. S. 740, 751.

[5] *Labor Board* v. *Reed & Prince Mfg. Co.,* 118 F. 2d 874, 883; *Peninsular & Occidental S. S. Co.* v. *Labor Board,* 98 F. 2d 411, 414. In 1944 the National Labor Relations Board held that an employer was guilty of an unfair labor practice where it refused to negotiate with the union's collective bargaining representative on the subject of a contract providing that none but union members should be employed. The Board held that such a refusal was an unfair labor practice. *In the Matter of Tampa Electric Co.,* 56 N. L. R. B. 1270, 1273. And see *Algoma Plywood Co.,* 26 N. L. R. B. 975, 994.

National Labor Relations Act. The action forced upon petitioner was pursuant to a thoroughly considered and well-established policy of the National War Labor Board.[6] Both the National War Labor Board and the Conciliation Division of the United States Department of Labor were charged with special duties in regard to labor disputes by the War Labor Disputes Act of June 25, 1943, 57 Stat. 163, 50 U. S. C. App. §§ 1501–1511. And the War Labor Disputes Act required both these federal agencies to conform to the provisions of the National Labor Relations Act. In order that these government agencies might be better able to carry out their statutory duty of conforming to the National Labor Relations Act, an interdepartmental committee was established. It consisted of representatives of the National Labor Relations Board, the Department of Labor, and the National War Labor Board. This committee was vested with power to discuss and consider policy questions and other problems relating to administration of the duties of the National Labor Relations Board and the National War Labor Board. This power was exercised. Rep. N. L. R. B. 74 (1943).

As early as April, 1942, the National War Labor Board in the *Little Steel Companies'* controversy, 1 War Lab. Rep. 325, asserted its power to require that contracts for maintenance of union membership be inserted in collective bargaining agreements. It reached the conclusion, see pp. 354–356, that such collective bargaining provisions were valid because they fell within the proviso of § 8 (3) of the National Labor Relations Act. From then on until 1945, when its last decisions were made, the National War Labor Board continued to require maintenance of membership contracts.[7]

---

[6] See for example, *Little Steel Companies*, 1 War Lab. Rep. 325; and *Industrial Cotton Mills Co.*, 25 War Lab. Rep. 136.

[7] *Douglas Aircraft Co.*, 28 War Lab. Rep. 51 (1945).

324

The most extensive discussion of the question directly involved in this case occurred in the National War Labor Board's opinion in *Greenebaum Tanning Co.*, 10 War Lab. Rep. 527. Greenebaum Tanning Co., a Wisconsin business, was engaged in interstate commerce and therefore was covered by the National Labor Relations Act. In the *Greenebaum* case, the National War Labor Board had to decide whether it could enforce a maintenance of union membership contract in Wisconsin contrary to the provisions of the very Wisconsin statute relied on by the Wisconsin Board in this case. It was decided over the strenuous objection of the company that the National War Labor Board had power to enforce contracts such as petitioner made here, despite the conflicting Wisconsin statute.[8] The Board found its power to override the state law in the war powers of the President, the War Labor Disputes Act, and the National Labor Relations Act. The National War Labor Board pointed out in the *Greenebaum* decision that, at the request of the President of the United States, it had first considered with the National Labor Relations Board the questions of the power of these Boards in cases such as the *Greenebaum* case. In holding that § 8 (3) of the National Labor Relations Act granted the employers and employees the right to make maintenance of union membership agreements, the Board at p. 543 stated: "The Board is satisfied that, were it not for the existence of the war emergency, the employees involved in this case would have had the right to demand maintenance of membership in favor of the designated representative of a major-

---

[8] In all of the cases below, the War Labor Board required insertion of the maintenance of membership clause despite local state statutes which prohibited such agreements. *Vilter Mfg. Co.*, 11 War Lab. Rep. 332; *U. S. Vanadium Corp.*, 13 War Lab. Rep. 527; *Ingalls Iron Works Co.*, 21 War Lab. Rep. 27; *St. Joe Paper Co.*, 25 War Lab. Rep. 421.

ity of employees. This right is granted to the employees under the National Labor Relations Act, and is a right which could be enforced in peace-time by the strike. If the Wisconsin Employment Peace Act requires more than a majority of employees to vote for maintenance of membership under those circumstances, it must be subordinated to the provisions of the National Labor Relations Act."

The foregoing is evidence that up to the time the Taft-Hartley Act was passed by Congress in 1947, § 8 (3) of the National Labor Relations Act had been accepted by government agencies as an unequivocal authorization for maintenance of union membership contracts. The Taft-Hartley Act expressly granted the states more leeway in regard to enforcement of their own policies as to contracts of the type here involved. 61 Stat. 136, 151, 29 U. S. C. § 164. And the National Labor Relations Board has now construed the new federal Act as precluding such contracts to the same extent that they are precluded by state law.[9] But it is significant that this interpretation rested entirely on the language and legislative history of the Taft-Hartley Act. The Board did not indicate any belief that this phase of the new Taft-Hartley Act was a mere clarification of the old Act.

Thus, up to 1943, when petitioner originally made this contract, and up to 1946 when it was automatically renewed, all indications were that § 8 (3) authorized the type of contract which federal authorities practically commanded petitioner to accept. There seemed to be no reason then why petitioner or any other employer should anticipate that § 8 (3) would be construed to permit states to nullify collective bargaining rights which

---

[9] *Giant Food Shopping Center* (1948), 77 N. L. R. B. (No. 153). The Taft-Hartley Act cannot justify this order of the Wisconsin Board because the Act was passed after the order was issued.

that section was generally supposed to have recognized. It is apparent from this record that petitioner entered into the contract and permitted its automatic renewal in the belief that § 8 (3) deprived the state of power to enforce its policy and that petitioner's reluctant action was due to pressure incident to the then accepted interpretation of § 8 (3).

Nevertheless, the Court now, after § 8 (3) is no longer the law, gives it an entirely new and apparently wholly unanticipated interpretation. Whether such new interpretation will affect the past conduct of any persons other than the parties to this action we do not know. We do know that a new interpretation will impose penalties on this employer for conduct pressed upon it by federal labor authorities under authority of the federal Act.

The new interpretation given § 8 (3) by the Court rests on the conclusion that the legislative history of the Act shows that Congress intended to leave states free to bar the type of contract here involved. The committee reports and legislative comments on the national Act set out in the Court's opinion do lend strong support to this contention. In the light of this legislative history, I would join in the Court's interpretation of § 8 (3) if we were interpreting that section on a clean slate. But we are not. The section has a history of administrative interpretation counter to the one that the Court gives it today. The language of § 8 (3)[10] is rea-

---

[10] "Sec. 8. It shall be an unfair labor practice for an employer—

.    .    .    .    .

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act, . . . or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership

sonably susceptible of the interpretation the section was given by the Conciliation Division of the United States Department of Labor and by the National War Labor Board, an interpretation to which the National Labor Relations Board appears to have assented. And, as previously pointed out, the National Labor Relations Board held this very petitioner guilty of an unfair labor practice for its refusal to bargain with its Wisconsin employees on their demand for a closed shop. *Algoma Plywood Co., supra* at 994, 998. This N. L. R. B. finding was in 1940, a year after the passage of the Wisconsin Act here held controlling. I think a change in the interpretation of § 8 (3) should not be made at this late date, when the section is no longer the law, merely to invalidate a contract made under federal compulsion and founded on a justifiable belief that § 8 (3) authorized the contract. I would not make a trap of this settled administrative interpretation by subjecting this employer to penal damages for his good faith reliance on it. See *Labor Board v. Hearst Publications*, 322 U. S. 111, 123.

I would reverse this judgment.

---

therein, if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made." 49 Stat. 449, 452, 29 U. S. C. § 158 (3).