27 N.J. Super. 579 (1953)
99 A.2d 833
ANNA KUZMA AND WILLIAM KUZMA, HER HUSBAND, PLAINTIFFS-APPELLANTS,
v.
MILLINERY WORKERS UNION LOCAL NO. 24, ABRAHAM MANDELLOWITZ, MORRIS HACKER AND ISADORE HERMAN, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 14, 1953.
Decided October 20, 1953.
*582 Before Judges EASTWOOD, JAYNE and FRANCIS.
Mr. J. Mortimer Rubenstein argued the cause for the appellants.
Mr. Irving Leuchter argued the cause for the respondents (Messrs. Kapelsohn, Lerner, Leuchter & Reitman, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
This appeal concerns itself primarily with the validity of a judgment of the Law Division disavowing jurisdiction of the subject matter of the action set forth in the complaint.
The appellants, Anna Kuzma and William Kuzma, are husband and wife. According to the complaint, which contains six counts, on and prior to April 9, 1951 Anna Kuzma was in the employ of Betmar Hat Company of Passaic, New *583 Jersey, and a member in good standing of the respondent Millinery Workers Union, which was the bargaining representative of the employees of the company. The individual respondents, Morris Hacker and Isadore Herman, are said to have been at the time "members, officers and agents of the union"; Abraham Mandellowitz, another named defendant, was not served with process and the action was discontinued as to him.
The vital allegation of the first count is that:
"The defendants, well knowing the premises as above set forth and willfully and maliciously contriving to injure the plaintiff, Anna Kuzma, did unlawfully, maliciously and wantonly and without legal or justifiable cause or excuse, willfully coerce, threaten, instigate, persuade, procure, entice and induce the officers, owners and agents of the said Betmar Hat Company to refuse to continue the said plaintiff, Anna Kuzma, in its said employment as a sewing machine operator, or in any other capacity, and to discharge the said plaintiff, Anna Kuzma, from said employment."
The third count is based upon the assertion of a conspiracy among the defendants to inflict the wrongs of which complaint is made.
The fifth count contains the further charge that in the same manner the defendants induced and coerced other employers, where the union was also the bargaining representative, to refuse to employ the plaintiff.
Then it is alleged that, as the result of these acts, this appellant was deprived of her employment and unable to obtain further employment in the industry, thereby suffered wage losses, "great pain, humiliation, mental and nervous anguish, and mental and emotional distress," and she was caused permanent nerve disability which required medical care.
Predicated on these charges, a demand is made for both compensatory and punitive damages against the defendants jointly and severally.
The other three counts set forth the derivative claim of the husband, William Kuzma, for medical expenses and loss of society and services of his wife.
*584 The pretrial order recites the factual claim of appellant employee to be that the union asked for a voluntary contribution to a collection taken in the plant for purposes of a gift to one of its officials, who was about to leave for Europe to attend a conference. When she refused, the union, through its agents the individual defendants, informed the employer that no union member would work in the shop until she was discharged. It is claimed also that the members in fact refused to return to their machines until she was discharged. The employer yielded and her employment was terminated.
Defendants first moved to strike from the three counts of Anna Kuzma the claim based upon pain, humiliation, mental anguish and emotional distress on the ground that under the cause of action pleaded such damages are not recoverable. And they moved also to dismiss the three per quod counts of the husband because the wife's cause of action was not such as to give rise to a claim by him for any relief. These motions were granted and the order is made one of the grounds of appeal.
Subsequently, the matter came on for trial and at this time the defendants moved for dismissal of the complaint upon the ground that the cause of action pleaded constituted an unfair labor practice under the National Labor Relations Act, and was therefore reparable exclusively before the National Labor Relations Board. The trial court concluded that the objection was well taken; that the Superior Court had no jurisdiction over the subject matter, and accordingly the dismissal was granted.
At the outset of our consideration of the case, it is plain that there must be a reversal. The National Labor Relations Act, both in its original and amended form, applies only to those industries whose employer-employee relations affect interstate commerce. 29 U.S.C.A. §§ 141, 142, 151, 152. There is no allegation in the complaint that the hat company is engaged in interstate commerce or that a labor dispute between it and its employees would affect commerce. Consequently there is no basis for the attachment of the jurisdiction of the National Labor Relations Board.
*585 This basic postulate of federal control was not discussed in the briefs of the parties. However, the Labor Board and the federal courts have taken an extremely broad and liberal view of the percentage of the operations of an employer, either in the form of raw materials coming to it in interstate commerce or of finished products moving out into interstate commerce, necessary to subject him to the federal control. N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); N.L.R.B. v. Fruehauf Trailer Co., 301 U.S. 49, 57 S.Ct. 642, 81 L.Ed. 918 (1937); N.L.R.B. v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 921 (1937); N.L.R.B. v. Associated Press, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937); Santa Cruz Fruit Packing Co. v. N.L.R.B., 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954 (1938); Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938); N.L.R.B. v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014 (1938); Jurisdiction of the National Labor Relations Board, 5 Univ. of Newark L. Rev. 224 et seq. Bearing this liberality in mind, in order to deal with the jurisdictional question as it was presented to the trial court and thus avoid the possibility of another appeal, we will assume that adequate proof exists of the hat company's interstate activities to bring it within the ambit of the board's authority.
It is a commonplace of constitutional law that the Federal Government has control over interstate commerce. If a Congressional enactment, either expressly or by necessary implication, occupies and preempts a particular field of commerce, state control thereof terminates. And this doctrine is applicable to the labor relations of employers whose operations are in commerce to the requisite degree. Amalgamated Ass'n of Street, Electric Railway & Motor Coach Employees, etc., v. Wisconsin Employment Relations Board, 340 U.S. 383, 71 S.Ct. 359, 95 L.Ed. 364 (1951); International Union of United Automobile, Aircraft and Agricultural Implement Workers, etc., v. O'Brien, 339 U.S. 454, 70 S.Ct. 781, 94 L.Ed. 978 (1950); La Crosse Telephone *586 Corp. v. Wisconsin Employment Relations Board, 336 U.S. 18, 69 S.Ct. 379, 93 L.Ed. 463 (1948); Plankington Packing Co. v. Wisconsin Employment Relations Board, 338 U.S. 953, 70 S.Ct. 491, 94 L.Ed. 588 (1950); Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U.S. 301, 69 S.Ct. 584, 93 L.Ed. 691 (1949).
The respondent contends that by virtue of the Labor-Management Act of 1947, supra, the acts charged against the union and its agents constitute an unfair labor practice, the remedy for which is exclusively in the hands of the National Labor Relations Board.
The original act made mandatory on employers the recognition of the right of employees to organize and to bargain collectively through agents of their own choosing, with respect to terms and conditions of employment. It also proscribed certain unfair labor practices by employers and committed to the National Labor Relations Board exclusive jurisdiction to prevent them. National Licorice Co. v. N.L.R.B., 309 U.S. 350, 365, 60 S.Ct. 569, 84 L.Ed. 799 (1940); Keller v. American Cyanamid Co., 132 N.J. Eq. 210 (Ch. 1942).
The 1947 amendment, commonly called the Taft-Hartley Act, established an unfair labor practice code for labor unions and their representatives. Section 7 provides that:
"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title." 29 U.S.C.A. § 157.
Section 8(b)(1) probihits a labor organization or its agents from interfering with the rights guaranteed in section 7. 29 U.S.C.A. § 158(b)(1). And section 8(b)(2) makes it an unfair labor practice for such organization or its agents "to cause or attempt to cause an employer to discriminate *587 against an employee in violation of subsection (a) (3) * * *" which forbids "discrimination in regard to hire or tenure of employment to encourage or discourage membership in any labor organization: * * *." 29 U.S.C.A. § 158(b)(2).
Section 10(a) empowers the National Labor Relations Board
"to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise; * * *." 29 U.S.C.A. § 160(a).
And in the event the board finds that a person has engaged in any such practice, it is required to state its findings and:
"* * * shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter. Provided, That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him." 29 U.S.C.A. § 160(c).
The sections referred to provide the foundation for respondents' argument that (1) the alleged conduct of the union and its agents constitutes an unfair labor practice, and (2) that since the board is empowered to award back wages, if such violation is found, Congress has preempted the field of redress for such conduct and deprived the state court of jurisdiction.
The notion that the traditional jurisdiction of the state court to enforce a common-law tort liability, has been removed by this federal enactment because the conduct constitutes an unfair labor practice as well, is as startling as it is novel. There is certainly no express declaration by Congress of such supersedure. And in the absence thereof, plainly the State should not yield its sovereignty unless the *588 intention to preempt and occupy the field is an inescapable conclusion from the language employed. This approach is not a mere manifestation of a chauvinistic desire for the perpetuation of state control but rather a recognition of a principle long since established by the United States Supreme Court.
In Texas & Pacific Ry. Co. v. Abilene Cotton Oil Company, 204 U.S. 426, 27 S.Ct. 350, 353, 51 L.Ed. 553, 557 (1907), that court said:
"As the right to recover [for exacting an unreasonable freight rate] was clearly within the principle just stated, and as it is conceded that the act to regulate commerce did not, in so many words, abrogate such right, it follows that the contention that the right was taken away by the act to regulate commerce rests upon the proposition that such result was accomplished by implication. In testing the correctness of this proposition we concede that we must be guided by the principle that repeals by implication are not favored, and, indeed, that a statute will not be construed as taking away a common-law right existing at the date of its enactment, * * * unless it be found that the pre-existing right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory." (Brackets ours)
See also California v. Zook, 336 U.S. 725, 733, 69 S.Ct. 841, 93 L.Ed. 1005 (1949).
Is there any such repugnancy here as would justify or require the conclusion we are asked to reach? Obviously if it were not for the provision relating to the assessment of back wages, the proposal would not have even the appearance of some substance. But in our judgment, the possibility, or even the probability, of an award of back wages in a case like the one before us, does not create the resounding collision between the federal act and the jurisdiction of our courts to redress the tort, which is a prerequisite to supersedure.
This legislation represents
"the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by *589 encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C.A. § 151.
Back wage assessments are just an incident of this over all national policy of preservation of industrial peace. No right thereto as a private or individual right has been created. Such back wages do not constitute "a private award operating by way of penalty or of damages. It is a public reparation order, operating retrospectively by way of an order to cease and desist as to unfair practices, from their beginning." Agwilines, Inc., v. N.L.R.B., 87 F.2d 146, 151 (5 Cir., 1936). In other words, the back pay assessment was designed as a vindication of public policy, and a deterrent against future violations.
Moreover, when considering the problem of preemption, it must be kept in mind that where the tort is established, the common law confers the right of recovery. The act permits the allowance of back wages if, in the judgment of the board, such an order will "effectuate" its policies. As the United States Supreme Court said:
"The remedy of back pay, it must be remembered, is entrusted to the Board's discretion; it is not mechanically compelled by the Act. And in applying its authority over back pay orders, the Board has not used stereotyped formulas but has availed itself of the freedom given it by Congress to attain just results in diverse, complicated situations. * * * The Board has a wide discretion to keep the present matter within reasonable bounds through flexible procedural devices." Phelps-Dodge Corp. v. N.L.R.B., 313 U.S. 177, 61 S.Ct. 845, 854, 85 L.Ed. 1271, 1285 (1941).
Study of the many cases in which such awards have been made, demonstrates that effectuation of national labor policy is the guide and not vindication of individual common-law rights. Regard for ordinary principles of personal damage is plainly subordinated to this end. (See footnote 7 to Phelps-Dodge Corp. v. N.L.R.B., supra: Back Pay Orders under the N.L.R.B., 48 Yale L.J. 1265 (1939).)
*590 An indication of the attitude of the Supreme Court toward the issue is probably furnished in Slocum v. Delaware, L. & W.R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795, 800 (1950), where the court discussed an earlier ruling in Moore v. Illinois Central R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089 (1941), involving the duty of a discharged railroad employee to use the voluntary administrative remedies supplied by the Railway Labor Act, 45 U.S.C.A., § 151 et seq., before pursuing a common-law remedy. This was said [339 U.S. 239, 70 S.Ct. 580]:
"Moore was discharged by the railroad. He could have challenged the validity of his discharge before the Board, seeking reinstatement and back pay. Instead he chose to accept the railroad's action in discharging him as final, thereby ceasing to be an employee, and brought suit claiming damages for breach of contract. As we there held, the Railway Labor Act does not bar courts from adjudicating such cases. A common-law or statutory action for wrongful discharge differs from any remedy which the Board has power to provide, and does not involve questions of future relations between the railroad and its other employees. If a court in handling such a case must consider some provision of a collective-bargaining agreement, its interpretation would of course have no binding effect on future interpretations by the board."
Cf. Marchitto v. Central R.R. of New Jersey, 9 N.J. 456 (1952).
One further matter bears consideration. As set forth above, section 10(a) (29 U.S.C.A., § 160(a)) provides that the control of the board over unfair labor practices "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: * * *." While the significance of this is perhaps not crystal clear, it is suggestive of a tolerance for common-law actions of the type being prosecuted by Mrs. Kuzma, which are not inconsistent with the scope or purpose of the Act.
In Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U.S. 767, 67 S.Ct. 1026, 1030, 91 L.Ed. 1234, 1245 (1947), although the court found a repugnancy *591 between the national and state legislation, which outlawed local action, it said:
"In the National Labor Relations Act, Congress has sought to reach some aspects of the employer-employee relation out of which such interferences [with commerce] arise. It has dealt with the subject or relationship but partially, and has left outside of the scope of its delegation other closely related matters. Where it leaves the employer-employee relation free of regulation in some aspects, it implies that in such matters federal policy is indifferent, and since it is indifferent to what the individual of his own volition may do we can only assume it to be equally indifferent to what he may do under the compulsion of the state."
All of these considerations lead us to the conclusion that there is no such repugnancy between the remedy provided by the Labor Act where an employee has been subjected to unfair labor practice by a labor union, and his common law remedy as would manifest a Congressional intention to emasculate the jurisdiction of the state courts. Cf. Barile v. Fisher, 197 Misc. 493, 94 N.Y.S.2d 346, 350 (Sup. Ct. 1949).
So we are brought to a determination of the propriety of the trial court's action in striking from paragraph 6 of the first count of the complaint the female appellant's damage claim for mental anguish, emotional distress and a permanent nervous disorder. This was erroneous.
The law on the subject is set forth in 15 Am. Jur. 596 as follows:
"In general, damages for mental anguish or suffering are recoverable when they are the natural or proximate result of an act committed maliciously, intentionally, or with such gross carelessness or recklessness as to show an utter indifference to the consequences when they must have been in the actor's mind. In most jurisdictions in fact, damages are recoverable for mental anguish and suffering caused by a willful, wanton, malicious, or intentional wrong, even though no bodily injury is sustained or other pecuniary damage alleged or proved."
Prosser on Torts, § 104, pp. 1012-1013, in discussing various measures of damages which have been recognized by *592 the courts for willful interference with contractual relations, says:
"A third, perhaps the most numerous [line of cases] has treated the tort as an intentional one, and has allowed recovery for unforeseen expenses, as well as for mental suffering, damages to reputation, and punitive damages, by analogy to the cases of intentional injury to person or property. In the light of the intent and lack of justification necessary to the tort, this seems clearly the most consistent result."
The Supreme Judicial Court of Massachusetts, in Doucette v. Sallinger, 228 Mass. 444, 117 N.E. 897 (1917), in a similar situation, declared flatly that one who willfully interferes with the employment relation and causes the discharge of an employee, is liable for the mental distress and anxiety suffered by him. See also United States Fidelity & Guaranty Co. v. Millonas, 206 Ala. 147, 89 So. 732, 29 A.L.R. 520 (Sup. Ct. 1921); Annotation 84 A.L.R. 96, 97; 29 A.L.R. 532.
Although research has disclosed no case in identity with the present issue, New Jersey manifestly recognizes the right of recovery. Spiegel v. Evergreen Cemetery Co., 117 N.J.L. 90 (Sup. Ct. 1936); Harris v. Delaware, L. & W.R. Co., 77 N.J.L. 278, 280, 281 (Sup. Ct. 1909).
Further error is charged in the striking of the three counts of the complaint which present the per quod claim of the husband, William Kuzma. In our judgment, these counts state a cause of action and should have been allowed to stand.
It is common knowledge that married women engage in various employment activities. As already indicated, where a discharge from employment is caused by the willful, malicious and oppressive act of another, those results which may be said to be the natural and proximate consequences are compensable. Spiegel v. Evergreen Cemetery Co., supra. More specifically, consequences which are reasonably foreseeable by the tortfeasor measure the responsibility. Since it is foreseeable that a wrongful act, such as charged here, may produce mental anguish and illness, in our present *593 state of society it is equally within the field of reasonable foresight that the mental anguish and illness of an employed wife may burden her husband with medical expenses and deprive him of her services and consortium.
As Prosser puts it:
"Any tort resulting in physical injury or incapacity of the wife * * * is sufficient to serve as a basis for such an action; * * * even false imprisonment and malicious prosecution or libel and slander, when they result in deprivation of services." (§ 102, p. 939.)
Cf. 27 Am. Jur. 102.
The trial court was not asked to pass upon the recoverability of punitive damages. However, both parties debate the question in their briefs in this Division.
The controlling principle is stated in Kinane v. Fay, 111 N.J.L. 553, 561 (Sup. Ct. 1933). There the defendant, a labor union leader, unlawfully and willfully interfered with plaintiff's employment by threats of a strike if plaintiff was not discharged. The court said:
"It is elementary law that where a defendant has been guilty of a malicious wrong, punitive damages may be recovered."
Cf. Hintz v. Roberts, 98 N.J.L. 768, 772 (E. & A. 1923); Dreimuller v. Rogow, 93 N.J.L. 1, 3 (Sup. Ct. 1919); Annotation 84 A.L.R. 97.
For the reasons stated, the judgment is reversed and the action remanded for trial.