No. 42,055

FLOYD M. HIGGINS, OSCAR WADDELL and BEULAH LAMUEL, *Appellants,* v. CARDINAL MANUFACTURING COMPANY, INC., a Corporation; GENERAL DRIVERS ALLIED AUTOMOTIVE AND PETROLEUM LOCAL UNION No. 498, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; C. B. BUTLER, individually, and as President of said Local No. 498, *Appellees,* and THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, (*Defendant.*)

(360 P. 2d 456)

Opinion filed March 17, 1961.

*J. D. Lysaught,* of Kansas City, and *Leonard F. Banowetz,* of Wichita, argued the cause, and *J. E. Schroeder, Lee E. Weeks* and *Leonard O. Thomas,* all of Kansas City, and *Jay W. Scovel* and *Robert K. Scovel,* both of Independence, were with them on the briefs for the appellants.

*Robert Fousek,* of Kansas City, Missouri, and *James H. Barnes,* of Kansas City, argued the cause and were on the briefs for the appellees, Local Union No. 498 and C. B. Butler.

*George E. McCullough, W. L. Parker, Jr., Robert B. Wareheim, Philip J. Saia* and *Buford L. Shankel,* of Topeka, for the Kansas State Federation of Labor, AFL-CIO, as *amicus curiae.*

*Joseph Bukaty* and *James H. Barnes,* both of Kansas City, for the Central Labor Council of Kansas City, Kansas, as *amicus curiae.*

*T. M. Lillard* and *O. B. Eidson,* both of Topeka, for the Kansas State Chamber of Commerce, Kansas Livestock Association, Kansas Farm Bureau, Kansas Cooperative Dairy Products Association and Kansans for the Right to Work, as *amici curiae.*

The opinion of the court was delivered by

SCHROEDER, J.: The question presented by this appeal is whether an "agency shop" provision in a labor contract is prohibited by the so-called "right to work" law of Kansas. The appellants are non-union employees covered by the applicable collective bargaining agreement and brought this action to enjoin *application* of the contract, and to secure a declaratory judgment of the court to determine the validity of the "agency shop" provision in the contract. The appellees by cross appeal challenge the jurisdiction of the court under the National Labor Relations Act.

Appeal has been duly perfected from an order sustaining a motion to dismiss a petition filed in the district court of Wyandotte County, Kansas. The motion was treated by both parties and the trial court as equivalent to a demurrer, since it challenged only the sufficiency of the petition to state a cause of action and the jurisdiction of the court as to the subject matter. Under these circumstances the well-pleaded facts in the petition are admitted, and the petition, not having been attacked by motion, is entitled to a liberal construction in favor of the pleader. The following facts are indicated by the petition.

The plaintiffs, Floyd M. Higgins, Oscar Waddell and Beulah Lamuel (appellants), are each residents of Wyandotte County, Kansas, and seniority employees in the production department of the defendant, Cardinal Manufacturing Company, Inc. (appellee), located in Kansas City, Kansas, where it is engaged in the business of the manufacture of television picture tubes and by-products.

The defendant, General Drivers Allied Automotive and Petroleum Local Union No. 498 (appellee), is a labor union and the duly certified bargaining agent for the employees of the defendant, Cardinal Manufacturing Company, Inc. The defendant, C. B. Butler (appellee), is president of the local union, which is an affiliate of the defendant, The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

The appellants brought the action as individuals and as representatives of such employees of Cardinal "who are not now members of said Local Union No. 498, or who may hereafter resign membership therein."

On or about the 15th day of November, 1958, the employer, recognizing the union as the exclusive bargaining agency for all employees within the "bargaining unit" as certified by the National Labor Relations Board, entered into an alleged security agreement which provides in part as follows:

"ARTICLE III.

"No Discrimination—Equal Benefits—Equal Obligations.

"SECTION 1. *Agency Shop* (a) Membership in the Union is not compulsory. Employees have the right to join, not join, maintain or drop their membership in the Union, as they see fit. Neither party shall exert any pressure on or discriminate against an employee as regards such matters.

"(b) Membership in the Union is separate, apart and distinct from the assumption by one of his equal obligation to the extent that he receives equal benefits. The Union is required, under this Agreement, to represent all of

the employees in the bargaining unit fairly and equally without regard as to whether or not an employee is a member of the Union. The terms of this Agreement have been made for all employees in the bargaining unit and not only for members in the Union and this Agreement has been executed by the Employer after it has satisfied itself as the result of a secret ballot that the Union is the choice of a majority of the employees in the bargaining unit and the Union has been certified by the National Labor Relations Board.

"(c) In accordance with the policy set forth under subparagraphs (a) and (b) of this Article, *all employees shall, as a condition of continued employment, pay to the Union, the employees' exclusive collective bargaining representative, an amount of money equal to that paid by other employees in the bargaining unit who are members of the Union, which shall be limited to an amount of money equal in the Union's regular and usual initiation fees, and its regular and usual dues and its general and uniform assessments.* For existing employees, such payments shall commence thirty (30) days following the date of execution of this Agreement and for new employees, the payments shall start sixty (60) days following the date of employment.

"(d) The Union agrees to indemnify the Company and hold the Company harmless from any final determination of liability to any employee by reason of the discharge of such employee if such discharge was caused or effected by a request of the Union, as provided for in the preceding paragraphs of this contract.

"The Company agrees to notify the Union of the pendency of any law suit which results from the discharge of an employee at the request of the Union within ten (10) days of the date of service of summons on the Company, and the Union obligates itself to defend the law suit.

"SECTION 2. The Employer agrees to deduct from the pay of all employees covered by this Agreement who so authorize in writing, dues, initiation fees and/or uniform assessments of the Local Union having jurisdiction over such employees and agrees to remit to said Local Union all such deductions. Where laws require written authorization by the employee, the same is to be furnished in the form required. No deduction shall be made which is prohibited by applicable law.

"ARTICLE XVII.

"Extra Contract Agreements.

"The Employer agrees not to enter into any agreement or contract with his employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement.

.   .   .   .   .   ,   .   '   .   .   .   .   .

"This Agreement shall be in full force and effect from November 15, 1958 to November 15, 1959, and shall continue in full force and effect from year to year thereafter unless written notice of desire to change or modify the Agreement is served by either party upon the other party at least sixty (60) days prior to the annual anniversary date." (Emphasis added.)

The appellants allege they "did not sign said agreement nor agree to the terms thereof, nor authorize any one to execute said agree-

ment in their behalf, nor have they joined said Union, nor do they intend to become members of said Union, that said plaintiffs have paid no sums of money to said Local Union as purportedly required by said Article III, but have refused so to do."

The appellants then allege "by certified mail the defendant, Local Union No. 498 on or about February 10, 1959, did advise each of these plaintiffs that unless Local Union No. 498 received from each of them the sum of Twelve ($12.00) Dollars, by March 1, 1959, that the defendant, C. B. Butler, as President of said Local Union No. 498, would request the defendant, Cardinal Manufacturing Company, to discharge each of said employees. A copy of said notice is hereto attached, marked, 'Exhibit B,' and made a part hereof."

In addition to the foregoing, which is a correct recitation of the substance of the notice, it recites:

"In accordance with the Taft-Hartley law, the Union must represent all employees in the bargaining unit regardless as to whether they are members of the Union or not, therefore, the Union has a right to charge employees a fee in the amount of the Union's monthly dues for services rendered."

By reason of the foregoing facts the appellants allege the provisions of the contract, and in particular Article III thereof, are void and in violation of Article 15, Section 12, of the Constitution of the State of Kansas, commonly known as the "right to work amendment" adopted by the electors of the State of Kansas on the 4th day of November, 1958, and G. S. 1949, 44-803. They allege their threatened discharge for failure to pay the equivalent of initiation fees, union dues and assessments is in complete disregard of their "rights under the law and as citizens of the State of Kansas," and that they will suffer irreparable harm and injury unless the court restrains and enjoins the defendants from such threatened action.

By further appropriate allegations they seek a temporary injunction during the pendency of the action, a permanent injunction, and a declaratory judgment concerning the controversy.

Upon the filing of the petition the trial court issued a temporary restraining order. Thereafter a motion to dismiss the action for injunction, and to dissolve the temporary restraining order, was filed by the union challenging the jurisdiction of the state court as to the subject matter under the National Labor Relations Act, and the sufficiency of the petition to state a cause of action under the laws of the State of Kansas.

The trial court overruled the motion on the jurisdictional ground, but sustained it on the ground the petition did not state a cause of action. The basis for the trial court's ruling was that the agency shop provision was not within the scope of the Kansas "right to work amendment." Actually the trial court decided it had jurisdiction to interpret the Kansas law, but it did not reach the jurisdictional question under the National Labor Relations Act. To protect their rights the appellees cross-appealed to keep both jurisdictional questions open.

It is conceded by the parties interstate commerce is affected by the business of Cardinal Manufacturing Company, Inc. This is apparent from the petition which incorporates the contract by reference. Under applicable federal legislation, 29 U. S. C., § 141, et seq., and particularly § 159 (c) (1) thereof, the National Labor Relations Board must determine that a question of representation affecting interstate commerce exists before directing an election or certifying any union as the bargaining agent for the employees.

The issue of union security presented by this case brings into focus a conflict between two firmly-held American beliefs: The belief that a worker should not be required to support an organization which he may oppose, and the belief that a worker should not be a "free rider" who takes advantage of benefits secured by a union without contributing his share to its support. That issue has been the subject of legislation at both the state and national levels.

The Kansas "right to work amendment" cannot be interpreted separate and apart from federal legislation affecting union-security agreements. In the evolution of Federal American Law three types of union-security provisions in collective bargaining agreements have commanded attention: (a) The closed shop provision requires membership in the contracting union before a job applicant can be employed and for the duration of his employment; (b) the union shop provision does not require an applicant to be a member of the union before he is hired, but it does require him to join, and usually to continue his membership in the union after he is hired; and (c) the agency shop provision requires nonunion employees, as well as union members, to pay union dues on the theory that the union as bargaining agent of all employees is entitled to the financial support of all.

Under the Wagner Act collective bargaining became the heart and core of labor relations and it has remained so. There were no

restraints under federal law upon the extent to which provisions for compulsory union membership could be inserted in collective bargaining agreements. Under the closed shop proviso nothing in the federal law was held to illegalize the confirmation of voluntary *closed shop* agreements. States, however, were permitted to pursue their own more restrictive policies. (See, *Algoma Plywood Co. v. Wis. Board,* 336 U. S. 301, 93 L. Ed. 691, 68 S. Ct. 584.)

By the Labor Management Relations Act, 1947, commonly known as the Taft-Hartley Act (29 U. S. C., § 141, *et seq.*) the closed shop provision in collective bargaining agreements was made illegal, but it did not abolish compulsory unionism. It gave sanction to the union shop in 29 U. S. C., § 158 (a) (3).

Under section 14 (b) of the Labor Management Relations Act, 1947, (29 U. S. C., § 164 [b]) Congress yielded to the states the authority to ban union shop agreements by providing:

"Nothing in this subchapter [act] shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

It is by virtue of this provision that states are permitted to enact so-called "right to work laws," which escape federal pre-emption under the Labor Management Relations Act, 1947, even though interstate commerce is affected. (*Algoma Plywood Co. v. Wis. Board,* supra.)

The foregoing provision is *paramount* to section 8 (a) (3) of the Act (29 U. S. C., § 158 [a] [3]), which provides in part:

"It shall be an unfair labor practice for an employer—

.   .   .   .   .   .   .   .   .   .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization  .  .  .  to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later,  .  .  .  *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization .  .  .  (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;"

On the 4th day of November, 1958, the people of the State of Kansas adopted an amendment to the Constitution of the State of Kansas, now designated as Article 15, Section 12, which reads:

"No person shall be denied the opportunity to obtain or retain employment because of membership or nonmembership in any labor organization, nor shall the state or any subdivision thereof, or any individual, corporation, or any kind of association enter into any agreement, written or oral, which excludes any person from employment or continuation of employment because of membership or nonmembership in any labor organization."

Although no legislation has been enacted in the State of Kansas pursuant to the foregoing constitutional amendment subsequent to its adoption on the 4th day of November, 1958, legislation on the subject was enacted in 1943 which presently appears as G. S. 1949, 44-803.

It is a settled rule of constitutional construction that prohibitive and restrictive constitutional provisions are self-executing and may be enforced by the courts independent of any legislative action, unless it appears from the language of the provision that the enactment of legislation is contemplated as a requisite to give it effect. The forgoing principle has been recognized in *Woodworth v. Bowles,* 61 Kan. 569, 60 Pac. 331; and *State ex rel., v. Mercantile Association,* 45 Kan. 351, 25 Pac. 984; see, also, *State, ex rel., v. Deck,* 106 Kan. 518, 188 Pac. 238; 16 C. J. S., Constitutional Law, § 49; and 11 Am. Jur., Constitutional Law, §§ 71 to 77.)

The collective bargaining agreement presently under consideration was executed by the employer and the union after the effective date of the foregoing constitutional amendment. Therefore, the question whether the agency shop provision is valid under the above Kansas constitutional amendment is directly presented.

The appellees argue the amendment in no way refers to contracts requiring the payment of service fees to a labor union; that its provisions only prohibit the enforcement of collective bargaining contracts which require "membership" or "nonmembership" in labor organizations. They argue the language is simple, plain and completely unambiguous.

A constitution must be interpreted liberally to carry into effect the principles of government which it embodies. It deals broadly with general subjects, and its language should not be interpreted in any narrow, refined or subtle sense, but should be held to mean what the words imply to the common understanding of men. (*State v. Sessions,* 84 Kan. 856, 115 Pac. 641.) The constitution is not to be

construed in a technical manner, but in ascertaining its meaning the courts consider the circumstances attending its adoption and what appears to have been the understanding of the people when they adopted it. (*Hunt v. Eddy*, 150 Kan. 1, 90 P. 2d 747; and *State, ex rel., v. Fadely*, 180 Kan. 652, 659, 308 P. 2d 537.)

Story was quoted with approval in *State v. Sessions*, supra, as follows:

" 'Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understanding. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and can not be presumed to admit in them any recondite meaning or any extraordinary gloss.' . . ." (1 Story on the Const., 5th Ed., § 451.)

When interpreting or construing a constitutional amendment, the court must examine the language used and view it in connection with the general facts and circumstances which caused the amendment to be submitted. (*State, ex rel., v. Anderson*, 180 Kan. 120, 299 P. 2d 1078.)

The basic issue upon which the campaign was conducted prior to the adoption of the constitutional amendment by the people of Kansas was whether or not the worker should be a "free rider" who takes advantage of benefits secured by a union without contributing his share to its support. Those supporting adoption of the amendment contended the worker should not be required to support a labor organization which he may oppose. Without question the people felt by adopting the amendment the decision would prevent the payment of forced tribute to any labor organization by any worker within the boundaries of this state.

It is apparent from the memorandum decision of the trial court that it looked for some specific provision in the Kansas constitutional amendment which prohibited the execution or application of a collective bargaining agreement requiring a nonmember employee to pay money to a labor union. Since no such specific provision was found, the trial court applied a narrow construction to the constitutional amendment.

The appellees contend Kansas was one of the last states to enact the so-called "right to work law." They argue approximately nineteen of the states enacted "right to work laws" prior to the adoption

of the Kansas constitutional amendment; that ten prohibited the collection of fees or charges without the employees' consent; and that nine did not so provide, among these being the State of Kansas. It is argued that inasmuch as the state legislators' attention had already been directed to the broader type of restraining law (In 1951 Senate Bill No. 116, incorporating the more restrictive language, failed to pass), and since there were in existence these two types of legislation dealing with this subject matter, known to the legislature at the time the particular constitutional amendment was suggested, it must be considered conclusive the legislature did not see fit to incorporate in the specific statute the more restrictive language.

It is unnecessary to consider in detail the laws of other states, some of which are constitutional amendments and others statutory enactments by the legislatures of the respective states. The foregoing argument of the appellees will be answered as our opinion further develops.

In support of the trial court's decision the appellees rely on *Meade Electric Company v. Hagberg*, (Ind.), 159 N. E. 2d 408. There the Second Division of the Indiana Appellate Court said the Indiana right to work law is plain and unambiguous, and there is no prohibition against a provision requiring the payment of fees or charges to a labor organization. It held the Indiana law merely prohibits agreements and conduct which conditions employment on *membership* in a labor organization.

The decision of the court that the proposed agency shop clause did not violate the Indiana right to work law, made consideration of further issues presented immaterial to its decision. The Indiana decision is analyzed by George Rose, an Indianapolis attorney, in an article entitled "The Agency Shop v. the Right-to-Work Law" in 9 Labor Law Journal, p. 579. For a different approach see an article by Norman E. Jones on "The Agency Shop" in 10 Labor Law Journal, p. 781.

In two particulars the *Meade* case must be distinguished from the facts presented by the instant appeal. First, the Indiana right to work law was a *legislative enactment* calling for a different rule of construction than is ordinarily applied to constitutional amendments. Second, the Indiana law contained a *penal* provision declaring violations thereof to be misdemeanors with penalties upon conviction as set forth therein. The Indiana court said in its opinion:

"The above-quoted Right to Work Law contains a penalty provision. The law is well settled that penal statutes will be strictly construed, and not con-

strued to include anything *beyond its letter, though within its spirit,* and it cannot be enlarged by construction, implication or intendment beyond the fair meaning of the language used. *Van Arsdall v. Indiana Bell Telephone Co.,* 1926, 84 Ind. App. 257, 259, 161 N. E. 19; *Evansville & Ohio Valley Railway Co., Inc. v. Southern Indiana Rural Electric Corporation, Inc.,* 1953, 231 Ind. 648, 652, 109 N. E. 2d 901 . . ." (p. 412.)

Here the court is not confronted with a penal statute to be strictly construed, but a remedial constitutional amendment to be liberally construed to effectuate the purpose for which it was adopted.

Clearly our state courts have jurisdiction to construe and interpret Kansas law—whether the agency shop clause in the instant case violates the Kansas constitutional amendment adopted pursuant to specific authorization granted by Congress. The construction of state constitutional and statutory provisions is left to the states in the first instance, if the state has authority to enact such law. (See, *Williams v. Oklahoma,* 358 U. S. 576, 3 L. Ed. 2d 516, 79 S. Ct. 421, rehearing denied, 359 U. S. 956, 3 L. Ed. 2d 763, 79 S. Ct. 737.)

This court has held when the interpretation of a statute (not penal in nature) according to the exact and literal import of its word would defeat the manifest purpose of the legislature in its enactment, it should be construed according to its spirit and reason, disregarding as far as may be necessary, the strict letter of the law. (*Clark v. Murray,* 141 Kan. 533, 41 P. 2d 1042.) One of the specific matters which may be considered in ascertaining the intention of the legislature, where it becomes material, is to fix what the situation was at the time of the enactment of the particular statute in controversy. (*Natural Gas Pipeline Co. v. Commission of Revenue & Taxation,* 163 Kan. 458, 183 P. 2d 234; see, also, *Hunziker v. School District,* 153 Kan. 102, 109 P. 2d 115, and authorities cited therein.) These rules become material concerning interpretation of the legislative enactment of 1957 pursuant to which the "right to work amendment" was submitted for referendum.

The rule in favor of liberal construction and against strict construction of a *statute* applies with even greater force when the court is interpreting constitutional provisions. Constitutional provisions are of necessity concise and general in their terms, while statutes, in general, are more specific.

The Kansas legislature in drafting the constitutional amendment must have been fully aware of the only criteria of membership recognized by the National Labor Relations Act, as amended. By virtue of the language in section 8 (*a*) (3) (B) of the Taft-Hartley

Act, heretofore quoted, it is apparent that the authority granted under this section is not primarily to compel membership in the union, but to permit the unions to *require* workers to pay dues and initiation fees to support the union. This is made clear by the Supreme Court of the United States in *Radio Officers v. Labor Board,* (1954), 347 U. S. 17, 98 L. Ed. 455, 74 S. Ct. 323. It was said in the opinion:

". . . Lengthy legislative debate preceded the 1947 amendment to the Act which thus limited permissible employer discrimination. *This legislative history clearly indicates that Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees. Thus Congress recognized the validity of unions' concern about 'free riders,' i. e.,* employees who receive the benefits of union representation but are unwilling to contribute their share of financial support to such union, and gave unions the power to contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason . . ." (pp. 40, 41.) (Emphasis added.)

In *Union Starch & Refining Co. v. National Labor Rel. Bd.,* (1951), 186 F. 2d 1008, employees who had offered to pay their dues and fees were rejected by the union because they were unwilling to take the obligation of membership, and their discharge was required. The Seventh Circuit Court upheld the National Labor Relations Board in ruling that the discharge was wrongful because if a union "imposes any other qualifications and conditions for membership with which he is unwilling to comply, such an employee may not be entitled to membership, but he is entitled to keep his job." In the opinion the court said:

"We agree that the Union had the right, under the statute here involved, to prescribe nondiscriminatory terms and conditions for acquiring membership in the Union, but we are unable to agree that it may adopt a rule that requires the discharge of an employee for reasons other than the failure of the employee to tender the periodic dues and initiation fees. . . ." (p. 1012.)

Similar decisions have been made under the 1951 amendment to the Railway Labor Act (45 U. S. C., § 152, Eleventh) which permits carriers and unions to enter into union·shop agreements. (*Pennsylvania R. Co. v. Rychlik,* [1957], 352 U. S. 480, 1 L. Ed. 2d 480, 77 S. Ct. 421; and *Railway Employes' Dept. v. Hanson,* [1956], 351 U. S. 225, 100 L. Ed. 1112, 76 S. Ct. 714.)

The distinction between the Railway Labor Act expressly permitting union shop contracts, notwithstanding state laws, and section 14·(*b*) of the Taft-Hartley Act was noted in the *Hanson* case.

It is clear from the foregoing decisions, construing the union shop sections of the above two acts, Congress intended that an employee who paid the required union initiation fees and dues fulfilled his obligation under a union shop contract, and that *the union could not require any other act as a condition of employment* usually required prior to becoming a member. Therefore, since the payment of union dues and fees is the only support of the union permitted by federal law *for unions to require as a condition of employment* under union-security agreements, and not actual membership, the expression "membership in a labor organization as a condition of employment" in section 14 (*b*) of the Taft-Hartley Act becomes synonomous with payment of union dues and fees for enforcement purposes under union-security agreements so far as labor unions or employers are concerned.

It may be conceded the term "membership" in any organization when standing alone and in its ordinary significance imposes various responsibilities and confers various privileges upon members. It also clothes the officers of the organization with authority to exercise certain disciplinary measures upon members. However, the term to be construed in this case is not simply "membership in a labor organization," but the more restricted expression "membership in a labor organization *as a condition of employment.*" Under these circumstances the language used by the Kansas legislature in drafting the constitutional amendment submitted for referendum assumes added significance, and the wording is not as clear and unambiguous as appellees would have us believe.

The natural and logical interpretation of the Kansas constitutional amendment, prohibiting compulsory membership in a labor organization as a condition of employment or continued employment, includes by necessary implication a prohibition against forced payment of initiation fees, union dues and assessments, or the equivalent, by a worker to a labor organization as a condition of employment or continued employment. This, we think, is the real and rather well-hidden meaning of the language employed by the legislature of Kansas in drafting the constitutional amendment submitted for referendum. The legislature must be considered to have been aware of the existing laws and decisions, above discussed, and it must have been aware that the courts have considered the required payment of union dues and fees as compliance with a contract provision requiring union membership, since under a

union shop provision, payment of dues and fees was all that could be required *as a condition of employment*. Thus, the legislature must have decided it was unnecessary to include a more explicit provision in the amendment, or that to do so would have been superfluous.

The alternative *would* require this court to declare that the constitutional amendment serves no useful purpose at all. It would permit the appellees to circumvent its natural and logical interpretation.

The question presently before the court was presented to the Arizona Superior Court in *Arizona Flame Restaurant, Inc. v. Baldwin*, 26 Labor Cases, ¶ 68,647; 34 L. R. R. M. 2707, affirmed as modified, *Baldwin v. Arizona Flame Restaurant*, 82 Ariz. 385, 313 P. 2d 759. The Arizona right to work amendment, A. R. S. Arizona Constitution, Article XXV (section 56-1302, A. C. A. 1952 Supp.; section 23-1302, A. R. S.) contains language almost identical to the Kansas constitutional amendment. There the defendant union demanded that the employer execute an agreement containing an agency shop clause, among others, in spite of the Arizona constitutional provision. The employer refused and picketing was commenced to enforce the union's demand (conduct beyond the facts in the instant case). Action was instituted to enjoin the picketing. In the opinion the trial court said:

". . . It is clear that it was the intent of the electorate to forbid both management and labor from imposing the requirement upon any person, as a condition of his employment, the participation by him in any form or scheme of employee representation. Consequently, it would require a most narrow and unrealistic construction of the existing laws to sanction a contract that would require employees not belonging to a union to contribute an assessment equal to the union dues to obtain or retain employment . . . This Court's duty, under the evidence herein, becomes clear with respect to a holding that the agency shop clause violates the law of this State." (p. 87, 172.)

On appeal the Supreme Court of Arizona found it unnecessary to determine whether the agency shop clause was lawful in the State of Arizona on the ground that the point had been abandoned.

The foregoing interpretation or construction of the Kansas constitutional amendment is in keeping with the common understanding of the citizens of Kansas who, after listening to and reading the arguments on both sides in a well-publicized campaign prior to the general election at which the matter was submitted for referendum, understood that adoption of the amendment would prevent the

payment of forced tribute to any labor organization as a condition of employment by any worker within the boundaries of this state.

We hold the so-called "agency shop" provision in the contract here under attack violates Article 15, Section 12, of the Kansas Constitution, declaring the public policy of the state as determined by popular vote of the people of Kansas.

The appellees contend the legislative history of the Kansas constitutional amendment indicates the legislature did not intend to forbid the "agency shop" provision in union-security agreements. They cite failure of Senate Bill No. 116, incorporating more restrictive language, to pass in the 1951 session of the legislature. This argument is at best highly speculative. Wholly aside from the reasons heretofore assigned for our conclusion, the legislature must have recognized in 1951 the laws of Kansas already included legislation adopted in 1943, now appearing as G. S. 1949, 44-803. It provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection, and such employees shall also have the right to refrain from any or all such activities."

The foregoing statutory language is identical to section 7 of the Taft-Hartley Act (29 U. S. C., § 157), omitting the exception authorized in section 8 (a) (3) of the act. Thus, while the Wagner Act was still in full force and effect, the legislature of Kansas had declared that which was against the public policy of the State of Kansas. In *Binder v. Local Union No. 685*, 181 Kan. 799, 317 P. 2d 871, it was said:

"Applicable Kansas statutes provide for the rights of employees, define the unlawful acts of an employer, or any other person, *and provide that which is against the public policy of this state.*" (p. 804.) (Emphasis added.)

The right of employees guaranteed in the foregoing statute to refrain from assisting labor organizations includes the right to refrain from giving financial assistance as well as personal assistance. In other words, 44-803, *supra*, prohibits forced payment of union dues and fees by employees to labor organizations. It is therefore logical to assume the legislature in 1951 may have considered it unnecessary to submit a constitutional amendment on the same subject for referendum.

Are the provisions of the Kansas constitutional "right to work amendment," as above construed, consistent with section 14 (b) of

the National Labor Relations Act, as amended? Embraced within this question is whether a state is permitted to invalidate contracts making employment conditional on the payment of dues and fees to a labor organization.

What has heretofore been said concerning the federal law, particularly the discussion leading up to construction of the expression "membership in a labor organization as a condition of employment" used by Congress in section 14 (b) of the Taft-Hartley Act, relates directly to the above question.

It is immaterial to our decision herein that the agency shop provision of the contract here under attack labels the charge to employees, as a condition of continued employment, *an amount of money equal to* that paid by other employees in the bargaining unit who are members of the Union, which shall be limited to *an amount of money equal in* the Union's regular and usual initiation fees, and its regular and usual dues and its general and uniform assessments." (Emphasis added.) This is nothing more than camouflage and is in substance a charge for union dues and fees within the meaning of section 8 (a) (3) (B) of the Taft-Hartley Act.

But for the Kansas "right to work" law the agency shop provision would presumably be a proper subject of negotiation in a collective bargaining agreement under the Taft-Hartley Act (*Public Service Company of Colorado,* [1950], 89 N. L. R. B. 418; and *American Seating Company,* [1952], 98 N. L. R. B. 800.) Recently the National Labor Relations Board in *General Motors Corp.,* (Feb. 20, 1961), 1961 C. C. H., N. L. R. B., ¶ 9663, p. 14,978, in a three to two decision held that an employer does not violate the National Labor Relations Act, as amended, by refusing to bargain with a union with respect to the inclusion in a bargaining contract, covering workers in a state which has a "right to work" law, of an agency shop provision which requires nonunion workers to pay the union, as a condition of continued employment, a fee equivalent to the dues and initiation fees paid by union members even though the agency shop is lawful under the state law. (See, *Meade Electric Company v. Hagberg,* [Ind.], supra.)

The material language in section 14 (b) of the Taft-Hartley Act is "agreements requiring *membership in a labor organization as a condition of employment.*" (Emphasis added.) Prior to the adoption of section 14 (b) the legislature of some states had adopted more detailed, technical statutory enactments dealing with this subject.

Not being in the broad form of constitutional amendments, these statutes provided not only that the right to work should not be abridged by reason of membership or nonmembership in labor organizations, but also contained the more detailed language, made possible by the legislative process, forbidding, in substance, any payments to any labor union or labor organization as a condition of employment or continued employment. Clearly, Congress had these state laws in mind prior to and at the time section 14 (*b*) was enacted.

This is evidenced by the report of the managers on the part of the House which states with reference to section 13 of the House Bill (HR 3020) and section 14 of the conference committee amendments:

"Under the House bill there was included a new section 13 of the National Labor Relations Act to assure that nothing in the Act was to be construed as authorizing any closed shop, union shop, *maintenance of membership, or other form of compulsory unionism agreement* in any State where the execution of such agreement would be contrary to state law. Many States have enacted laws or adopted constitutional provisions *to make all forms of compulsory unionism* in those States illegal. *It was never the intention* of the National Labor Relations Act, as is disclosed by the legislative history of that Act, *to pre-empt the field* in this regard so as to deprive the States of their powers to prevent compulsory unionism. Neither the so-called 'closed shop' proviso in section 8 (3) of the existing Act nor the union shop and maintenance of membership proviso in section 8 (*a*) (3) of the conference agreement could be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy. To make certain that there should be no question about this, section 13 was included in the House bill. The conference agreement, in section 14 (*b*), contains a provision having the same effect." (93 Cong. Rec., June 4, 1947, p. 6378.) (Emphasis added.)

With this background and the expressed intent of Congress to leave the states free to prevent all forms of compulsory unionism, and taking into consideration many other states which have adopted detailed statutes, and many states such as Kansas which have adopted the broader use of constitutional amendments designed to accomplish the same purpose, there is little question that Congress and many state legislatures have construed the words "membership in a labor organization as a condition of employment" as embracing and including forced payments to unions of dues, fees and other charges regardless of the appellation applied thereto.

Obviously, if this were not true and the "agency shop" provision in a union-security agreement is not within the compass of section 14 (*b*), statutes in those states in which the more detailed language

has been used prohibiting forced payments to unions of dues, fees and other charges would fall by their own weight. In view of the language used in section 14 .(*b*) there seems to be little purpose for the states to enact laws or adopt constitutional amendments in the more detailed terminology. The language used in the Kansas constitutional amendment is substantially the same language used in section 14 (*b*).

The fallacy of the trial court's decision, as reflected by its memorandum, is that it assumes Congress intended section 14 (*b*) as a grant of authority to the states to enact "right to work" laws which prohibit the agency shop provision, requiring workers to pay the regular union dues, fees and assessments, but refuses to construe the Kansas constitutional amendment, not having contained such specific provision, although worded in substantially the same language as section 14 (*b*), in the same manner: Section 14 (*b*), like the Kansas amendment, contains no specific provision prohibiting agreements which require workers to pay dues, fees and assessments, as a condition of employment. Such a prohibitory provision is, for the reasons mentioned, necessarily implied, the payment of such sums to the union being an incident of union membership. The trial court, having correctly assumed that such a prohibitory provision was implied in section 14 (*b*), was completely inconsistent in holding that it was not also implied in the Kansas constitutional amendment.

Does a state court have jurisdiction to grant the injunctive relief requested by the appellants or is this matter within the exclusive domain of the National Labor Relations Board under the federal pre-emption doctrine?

Section 14 (*b*) of the Taft-Hartley Act was before the United States Supreme Court in *Algoma Plywood Co. v. Wis.·Board*, 336 U. S. 301, 93 L. Ed. 691, 69 S. Ct. 584. There the Wisconsin Employment Relations Board ordered an employer to cease and desist from giving effect to a *maintenance of membership clause* in a collective bargaining agreement on the ground that such clause was in violation of state statute. On writ of certiorari the Supreme Court affirmed *the power of the state to enforce its statute*. The opinion notes that 95% of the employer's production was sold in interstate commerce. In the opinion it was said:

". . . Had the sponsors of the National Labor Relations Act meant to deny effect to State policies inconsistent with the unrestricted enforcement of union-shop contracts, surely they would have made their purpose manifest . . ." (p. 306.)

After a review of the legislative history, the court went on to state:

"Other provisions of the Taft-Hartley Act make it even clearer than the National Labor Relations Act that the States are left free to pursue their own more restrictive policies in the matter of *union-security agreements. Because § 8 (3) of the new Act forbids the closed shop and strictly regulates the conditions under which a union-shop agreement may be entered, § 14 (b) was included to forestall the inference that federal policy was to be exclusive* . . .

". . . But if there could be any doubt that the language of the section means that the Act shall not be construed to authorize any 'application' of a *union-security contract*, such as discharging an employee, which under the circumstances 'is prohibited' by the State, the legislative history of the section would dispel it. See S. Rep. No. 105, 80th Cong., 1st Sess. 5-7; H. R. Rep. No. 245, 80th Cong., 1st Sess. 9, 34, 40, 44; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 60; 93 Cong. Rec. 3554, 3559, 4904, 6383-84, 6446; H. R. 3020, 80th Cong., 1st Sess., as reported, § 13." (pp. 313, 314.) (Emphasis added.)

While the court in *Algoma* was not confronted with an agency shop provision in a collective bargaining agreement, as here, it did involve *the application* of an agreement containing a union-security provision, a maintenance of membership clause in a union shop provision. It was not complicated by independent conduct defined as an unfair labor practice under the National Labor Relations Act or the Taft-Hartley Act. We are confronted solely with *the application* of a contract containing a union-security provision, an agency shop provision, and except insofar as *execution or application of the agreement* itself may also involve a protected or prohibited activity under the Taft-Hartley Act, the case is not complicated by independent conduct which may arguably be a protected or prohibited activity under the act.

The union contends the *Algoma* decision has been overruled by *Plankinton Packing Co. v. Wisconsin Employment Relations Board et al.*, 338 U. S. 953, 94 L. Ed. 588, 70 S. Ct. 491. There certiorari was granted and the Supreme Court of Wisconsin reversed in a *per curiam* decision by the United States Supreme Court, citing *Bethlehem Co. v. State Board*, 330 U. S. 767, 91 L. Ed. 1234, 67 S. Ct. 1026; and *La Crosse Tel. Corp. v. Wis. Board*, 336 U. S. 18, 93 L. Ed. 463, 69 S. Ct. 379. (See, *Wisconsin E. R. Board v. Plankinton Packing Co.*, 255 Wis. 285, 38 N. W. 2d 688.) We do not agree. While it is true the Wisconsin court cited the *Algoma* decision as authority for its ruling, it does not follow that the *per curiam* reversal overruled *Algoma*. In *Algoma* the court was confronted with

the *application* of a union-security provision in a collective bargaining agreement, while in *Plankinton* the facts disclosed *independent conduct* intended to coerce and intimidate the complainant and to bring about his loss of employment because he had exercised his right to refrain from membership in the respondent union. It also involved conduct by the officers, agents and employees of the respondent union intended to coerce, intimidate and induce the respondent employer to discharge the complainant. This independent conduct fell within the category of unfair labor practices prohibited by section 8 of the Taft-Hartley Act and was within the domain of federal pre-emption.

The union also relies on United States Supreme Court opinions involving complaints that certain activities of unions violated a state "right to work" law. They cite *Local Union 429, International Brotherhood of Electrical Workers, A. F. of L., et al. v. Farnsworth & Chambers Co., Inc.*, 353 U. S. 969, 1 L. Ed. 2d 1133, 77 S. Ct. 1056; and *Youngdahl v. Rainfair, Inc.*, 355 U. S. 131, 2 L. Ed. 2d 151, 78 S. Ct. 206.

In *Farnsworth* a representative of the union approached the employer and protested that the employer was not employing union labor and threatened to vacate the plant if union laborers were not employed. Upon refusal peaceful picketing resulted, and injunctive relief followed. Certiorari was granted and the Tennessee court reversed in a *per curiam* decision, citing *Weber v. Anheuser-Busch, Inc.*, 348 U. S. 468, 99 L. Ed. 546, 75 S. Ct. 480; and *Garner v. Teamsters Union*, 346 U. S. 485, 98 L. Ed. 228, 74 S. Ct. 161. (See, *Farnsworth & Chbrs. v. I. B. E. W. 429*, 201 Tenn. 329, 299 S. W. 2d 8.) On similar facts this court recognized the domain of federal pre-emption in *Kaw Paving Co. v. International Union of Operating Engineers*, 178 Kan. 467, 290 P. 2d 110.

In the *Youngdahl* case the employees of the plant were not members of a labor union. In an effort to compel the employer to recognize the union as the bargaining agent of the employees, some of the employees struck and picketed the plant. The picketing was accompanied by conduct calculated to provoke violence, and the trial court issued a blanket injunction against all conduct which the Arkansas Supreme Court affirmed. The United States Supreme Court reversed to the extent that the injunction prohibited peaceful picketing of the employer's premises. There the board had not conducted a representation election nor had the union been certi-

fied. In an election conducted after the injunction was issued a majority of the employees voted not to be represented by the union.

These cases do not control the facts presently before the court, since neither related to either the *execution or application of agreements* requiring membership in a labor organization as a condition of employment. Insofar as federal pre-emption was asserted they relate to independent conduct which was either protected or prohibited under the Taft-Hartley Act.

In reliance upon the provisions of section 14 (*b*) the union contends, regarding agreements prohibited by state law, that "the employer and Union negotiating such a contract in Kansas would violate Section 7 of the National Labor Relations Act and in this case the employer would violate Section 8 (*a*) (1) of the National Labor Relations Act by interfering with the rights of employees guaranteed by Section 7 and also violate Section 8 (*a*) (3) of the Act by discrimination in regard to a term or condition of employment for the purpose of encouraging membership in a labor organization. The Union would violate 8 (*b*) (1) of the Act by restraining employees in the exercise of their rights guaranteed by Section 7 and the union would violate 8 (*b*) (2) by causing an employer to discriminate against an employee in violation of Section 8 (*a*) (3)." Therefore, it is argued control over such conduct falls within the domain of federal pre-emption and is governed exclusively through the National Labor Relations Board. They rely upon *San Diego Unions v. Garmon*, 359 U. S. 236, 3 L. Ed. 2d 775, 79 S. Ct. 773, which is the second appearance of the case before the United States Supreme Court. There the unions sought from the respondents an agreement to retain in their employ only those workers who were already employees of the union, or who applied for membership within thirty days. The respondents refused claiming that none of their employees had shown a desire to join the union, and that in any event they could not accept such arrangement until one of the unions had been designated by the employees as a collective bargaining agent. The unions began at once to peacefully picket the respondents' place of business, and to assert pressure on customers and suppliers in order to persuade them to stop dealing with respondents. The sole purpose of these pressures was to compel execution of the proposed contract. This conduct was held to be within the domain of federal pre-emption under the Taft-Hartley Act.

On similar facts nearly two years before the second *Garmon* decision was announced this court applied the doctrine of federal pre-emption in *Asphalt Paving v. Local Union*, 181 Kan. 775, 317 P. 2d 349, in which the provisions of section 14 (*b*) of Taft-Hartley were asserted.

We are not unmindful of the broad sweep of the language used in the second *Garmon* decision and particularly the following language which appears to summarize the doctrine of federal pre-emption:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield . . ." (p. 244.)

and further in the opinion where the court says:

". . . When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." (p. 245.)

However, in view of *Algoma*, to which the Federal Supreme Court adheres as we construe the decisions, we do not regard the second *Garmon* decision as controlling of the facts in the instant case. *Algoma* was cited with approval in *Weber v. Anheuser-Busch, Inc.*, 348 U. S. 468, 99 L. Ed. 546, 75 S. Ct. 480, which dealt with federal pre-emption under the Taft-Hartley Act, in the following language:

"The Court allowed a State to forbid .enforcement of a maintenance-of-membership clause in a contract between employer and union in *Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board*, 336 U. S. 301. Since nothing in the Wagner or Taft-Hartley Acts sanctioned or forbade these clauses, they were left to regulation by the State." (p. 477.)

As recently as January 19, 1959, the Supreme Court pointed out the special position occupied by the states under section 14 (*b*) of Taft-Hartley. The following footnote appears in *Teamsters Union v. Oliver*, 358 U. S. 283, 296, 297, 3 L. Ed. 2d 312, 79 S. Ct. 297:

"10. In *Algoma*, state law was allowed to operate to restrict a provision of a collective bargaining contract only after it was found after an exhaustive examination of the legislative history of the Wagner Act that Congress intended to leave the special subject of the legality of maintenance of membership clauses up to the States through § 8 (3) of that Act, 49 Stat. 452. Questions of the nature that we consider today were expressly left open. 366 U. S., at 312."

The union's contention that state authority is ousted because the union was certified by the National Labor Relations Board was answered in *Algoma* as follows:

"It remains to consider whether certification of the Union by the National Labor Relations Board in 1942 thereby forever ousted jurisdiction of the Wisconsin Board to enjoin practices forbidden by Wisconsin law. Since the enumeration by the Wagner Act and the Taft-Hartley Act of unfair labor practices over which the National Board has exclusive jurisdiction does not prevent the States from enforcing their own policies in matters not governed by the federal law, such freedom of action by a State cannot be lost because the National Board has once held an election under the Wagner Act. *The character of activities left to State regulation is not changed by the fact of certification.* Certification, it is true, makes clear that the employer and the union are subject to federal law, but that is not disputed. So far as the relationship of State and national power is concerned, certification amounts to no more than an assertion that as to this employer the State shall not impose a policy inconsistent with national policy, *Hill v. Florida,* 325 U. S. 538, or the National Board's interpretation of that policy, *Bethlehem Steel Co. v. New York S. L. R. B.,* 330 U. S. 767; *La Crosse Telephone Corp. v. Wisconsin E. R. B.,* 336 U. S. 18. *Indeed, the express disclaimer in § 8 (3) of the National Labor Relations Act of intention to interfere with State law and the permission granted the States by § 14 (b) of the Taft-Hartley Act to carry out policies inconsistent with the Taft-Hartley Act itself, would be·practically meaningless if so easily avoided. For these provisions can have application, obviously, only where State and federal power are concurrent; it would have been futile to disclaim the assertion of federal policy over areas which the commerce power does not reach."* (pp. 314, 315.) (Emphasis added.)

In *Bus Employees v. Wisconsin Board,* (1951), 340 U. S. 383, 95 L. Ed. 364, 71 S. Ct. 359, it was said Congress knew full well that its labor legislation pre-empts the field that the act covers insofar as commerce within the meaning of the act is concerned, and demonstrated its ability to spell out with particularity those areas *in which it desired state regulation to be operative,* citing among other sections 14 (b) of the Taft-Hartley Act.

As we construe the decisions of the United States Supreme Court the question presented by the instant case is not whether the union or the employer might be guilty of unfair labor practices under the Taft-Hartley Act in executing the labor relations agreement in controversy containing the agency shop provision, or in its application. In yielding to the states permission to enact "right to work" laws by section 14 (b), Congress granted authority to the state courts to process violations of such laws. There would be little point in permitting the states to enact such laws if they could not be enforced by the states.

Several Kansas works have been published since the adoption of the Kansas "right to work amendment:" Banowetz, Is Compulsory Unionism Now Barred in Kansas?, 27 J. B. K. 207 (1958); Beaty, The Agency Shop Agreement and The Right-to-Work Law, 27 J. B. K. 348 (1959); and Hopson, Whither Hurried Hence—The New Right to Work Amendment, 8 Kan. L. Rev. 18.

In conclusion we hold the decision of the district court violates the true intent and purpose of the Kansas constitutional amendment (Art. 15 § 12), commonly known as the "right to work amendment," which is properly within the scope of section 14 (b) of the Taft-Hartley Act pursuant to which it was adopted, and the courts of this state have jurisdiction to process violations of such amendment.

The order of the lower court sustaining the motion to dismiss the action is reversed.